# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE

## Chattanooga Division

| | |
|---|---|
| Tonnette Bonds | )<br>) |
| Plaintiff, | )<br>) |
| v. | ) Civil Action No:<br>)<br>) |
| HHS Environmental Services, LLC, | ) JURY DEMAND<br>) |
| Defendant. | )<br>) |

## COMPLAINT

Plaintiff Tonnette Bonds, by counsel, respectfully represents to the Court the following as her Complaint against Defendant HHS Environmental Services, LLC:

### Nature of Case and Jurisdiction

1. This is a suit by an employee against her former employer for race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.*

2. The suit involves federal questions establishing jurisdiction under 28 U.S.C. §1331.

### Parties

3. Bonds is a United States citizen and a resident of Hamilton County, Tennessee.

4. HHS is a Tennessee limited liability corporation operating in Hamilton County, Tennessee with principal address in Dripping Springs, Texas.

5. HHS has over 17,000 employees working at more than 500 facilities in the U.S. and internationally.

6. A core business of HHS is providing cleaning services in hospitals.

## Pertinent Facts

*Bonds' Housekeeping Career*

7. Bonds is 53 years old. She is black.

8. Bonds has been a professional housekeeper for at least twenty years.

9. For at least ten years ending March 14, 2019, Bonds was a professional housekeeper at Parkridge East Hospital (the Hospital) in Chattanooga.

10. The duties of a professional housekeeper include cleaning patient rooms, surgical rooms, ER rooms, radiology and other testing rooms, freshening patient-occupied rooms, and interacting with patients and hospital staff to better serve them.

11. Housekeepers may have contact with seriously ill patients, requiring their use of Personal Protective Equipment (PPE).

12. Beginning in approximately 2008 the Hospital began contracting out housekeeping services, making Bonds an HHS housekeeping employee rather than a Hospital employee.

13. For over ten years Bonds enjoyed an excellent employment relationship with HHS. She had no significant disciplinary issues, she had a remarkable attendance record, and she was known by HHS managers to be hard-working and dependable, with a passion for her work.

14. Bonds also enjoyed excellent relationships with the Hospital staff and patients she worked with and served every day. On February 12, 2019, one month before HHS fired her, Bonds won the Hospital's I.H.E.A.L. award ("Honesty.Excellence.Accountability.Leadership.")

The Hospital CEO presented the award to Bonds, along with a $500 check, at a ceremony attended by Hospital staff and by HHS' Environmental Services Director, Jamie Toscano.

15. For Bonds' service as a ten-year veteran HHS front-line essential worker, HHS paid her $12.30 per hour, which is before tax pay of about $492 per week.

16. Bonds' children are grown, self-supporting adults, but she lives with and supports her elderly mother.

17. At her HHS pay rate, Bonds found it necessary to support herself and her mother to work half-time at another housekeeping job for another hospital employer. She worked over 60 hours per week total for the two employers.

18. Despite this seemingly exhausting schedule, Bonds had accumulated dozens of hours of unused HHS paid-time-off at the time of her termination.

19. A major motivator for Bonds to continue her work despite the low pay and long hours was the relationships she enjoyed with Hospital staff and patients. She found meaning for her life in her daily opportunities to serve others undergoing the stress of hospitalization.

*HHS Changes Management at the Hospital*

20. Bonds worked second shift at the Hospital, the evening shift. The other housekeeping shifts were first (the day shift), and third (the night shift).

21. In about November, 2018, HHS placed a new-hire, Andrea Benson, as second shift housekeeping supervisor.

22. At the time Benson became its supervisor, second shift employed ten housekeepers, seven black, and three white, including one Hispanic. *For the remainder of her*

*allegations, Bonds includes any Hispanic housekeepers among white housekeepers since Benson and Toscani treated whites and Hispanics the same and differently than black housekeepers.*

23. At about the beginning of 2019, HHS made Jamie Toscani Environmental Services Director (Director) for the Hospital, replacing long-time Director Terrence Taylor.

24. The Director is the senior-most HHS manager at the Hospital. The Director has hiring and firing power over housekeepers.

25. Shift Supervisors, like Benson, did not have the power to hire and fire. Benson had to obtain Toscani's approval for any hiring and firing.

26. In the approximate six-month period between Benson's hire in about November, 2018 until at the latest May, 2019, six of the seven black housekeepers on second shift departed the shift. All were replaced by whites, except for one position remaining vacant or eliminated.

27. Of the six departed black second-shift housekeepers, three, including Bonds, were fired; one quit because Benson and Toscani drastically reduced her hours; one asked for and received a transfer to third shift because she found it intolerable as a black person to work for Benson; and one quit due to a move from the Chattanooga area.

28. All of these departures of black housekeepers and their replacements by white housekeepers occurred after the beginning of 2019 when Toscani became Director.

29. Racial composition of first and third shift housekeepers remained stable over the same time period.

### Benson's Treatment of Black Housekeepers

30. Benson treated black housekeepers differently than she treated white housekeepers.

31. Benson treated white housekeepers as individuals, she treated black housekeepers as a group.

32. Benson addressed and referred to white housekeepers by their names.

33. Benson did not address black housekeepers by name. Instead she addressed and referred to them as "Girl," and "Girly," and in at least one instance as "Colored Girl."

34. To black housekeepers, Benson appeared not to know or want to know them as individuals, but only as a group she did not respect.

35. Benson's tone and directions to white housekeepers were polite and respectful.

36. Benson's tone and directions to black housekeepers were curt and often angry. She spoke down to them.

37. Multiple black housekeepers including Bonds asked Benson to call them by name and treat them more respectfully, the same as she treated white housekeepers.

38. Benson disregarded and even laughed at such requests from black housekeepers. She seemed to them to enjoy addressing them as "Girl" or "Girly" after they had asked to be called by name.

39. Benson was a working supervisor, but unlike her shift supervisor predecessors, she did little or no housekeeping work and ordered black housekeepers to do work for her that she could and should have performed herself.

5

### Black Housekeepers Complain to Toscani about Benson's Treatment

40. At least five black housekeepers on second shift, including Bonds, complained to Toscani about Benson's treatment of them compared to white housekeepers.

41. Toscani never got back to a single one of the complaining black housekeepers about their complaints of Benson's treatment.

42. After the complaints to Toscani about her behavior toward black housekeepers, Benson seemed to double-down on and to enjoy engaging in the same behaviors, as if she were provoking black housekeepers to either act out towards her or to quit.

### Toscani Replaces Black Housekeepers with White Housekeepers

43. Because Toscani and Benson depleted second shift of five black housekeepers and another black housekeeper voluntarily quit, there were multiple job openings for second shift housekeepers at the Hospital in early to mid-2019.

44. During early to mid-2019, Toscani told at least two qualified black applicants for the open second shift jobs either that HHS had no housekeeping openings or simply that he would keep the applications on file with no follow-up and no encouragement to the black applicants.

45. Toscani hired all white applicants to replace the black housekeepers he and Benson had fired or caused to quit, including Bonds.

46. Whatever Toscani's racial animus, or lack thereof, towards black housekeepers, he acted at all relevant times in his hiring and firing of second shift housekeepers to accommodate Shift Supervisor Benson's evident racial animus towards black housekeepers.

47. Toscani and Benson used racially neutral, but vague and subjective HHS disciplinary and other policies and procedures (i) to fire or cause the removal from second shift of black housekeepers and (ii) to replace them with white housekeepers.

48. Toscani's use of his managerial authority under HHS policies and procedures to deplete black housekeepers and replace them with white housekeepers had a Title VII-prohibited disparate impact on black second shift housekeepers.

Count 1 – Race Discrimination

49. HHS' termination of Bonds violated Title VII's prohibition of race discrimination in employment practices as intentionally discriminatory adverse treatment and as disparate impact.

50. As a result of HHS' violations of Title VII, Bonds has suffered loss of pay, past and future, emotional distress, past and future, including embarrassment, humiliation, and loss of enjoyment of her long-established relationships at the Hospital, and she has incurred and will continue to incur attorney's fees and costs.

51. For its violation of Title VII, HHS is liable to Bonds for back pay, reinstatement or front pay in lieu of reinstatement, compensatory damages for emotional distress, attorneys' fees and costs.

Count 2 – Retaliation

52. HHS' conduct resulting in Bonds' termination violated Title VII's prohibition against retaliation for engaging in protected activity.

53. Bonds' protected activity included her complaints to Benson and to Toscani of Benson's disparate treatment of black second-shift housekeepers.

54. As a result of HHS' retaliation in violation of Title VII, Bonds has suffered loss of pay, past and future, emotional distress, past and future, including embarrassment, humiliation, and loss of enjoyment of her long-established relationships at the Hospital, and she has incurred and will continue to incur attorney's fees and costs.

55. For its retaliation in violation of Title VII, HHS is liable to Bonds for back pay, reinstatement or front pay in lieu of reinstatement, compensatory damages for emotional distress and attorneys' fees and costs.

## Count 3 – Racial Harassment

56. HHS violated Title VII' prohibition of racial harassment by its supervisory treatment of Bonds despite her complaints to responsible management of her supervisor's harassment.

57. The harassing supervisory treatment not only continued after her complaints to responsible management, it increased and became deliberately provocative, motivated by an intention to make quit or to provoke her into acting out in her defense.

58. As a result of HHS' harassment in violation of Title VII, Bonds has suffered loss of pay, past and future, emotional distress, past and future, including embarrassment, humiliation, and loss of enjoyment of her long-established relationships at the Hospital, and she has incurred and will continue to incur attorney's fees and costs.

59. For its racial harassment in violation of Title VII, HHS is liable to Bonds for back pay, reinstatement or front-pay in lieu of reinstatement, compensatory damages for her emotional distress, and for her attorneys' fees and costs.

## Punitive Damages

60. For its reckless disregard of Bonds' federally protected rights and for its deliberate indifference to evident discrimination, HHS is subject to an appropriate award of punitive damages.

WHEREFORE, Plaintiff Tonnette Bonds respectfully requests that the Court convene a jury to hear her claims, and thereafter award her equitable relief, damages, attorneys' fees and costs as specified in her claims.

Respectfully Submitted,

TONNETTE BONDS

By Counsel

s/James M. Johnson
James M. Johnson
BPR #026147
620 Lindsay Street
Suite 210
Chattanooga, TN 37403
(423) 648 4093
(423) 648 4094 (fax)
jj@jamesmjohnsonatty.com

Counsel for Plaintiff